UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| DENISE SUNDQUIST, derivatively and on behalf of THE ALLSTATE CORPORATION,<br><br>     Plaintiff,<br><br>  v.<br><br>THOMAS J. WILSON, STEVEN E. SHEBIK, JUDITH A. SPRIESER, KERMIT R. CRAWFORD, MICHAEL L. ESKEW, F. DUANE ACKERMAN, JACK M. GREENBERG, ROBERT D. BEYER, HERBERT L. HENKEL, SIDDHARTH N. MEHTA, ANDREA REDMOND, JOHN W. ROWE, MARY ALICE W. TAYLOR, JACQUES P. PEROLD, and MATTHEW E. WINTER,<br><br>     Defendants,<br><br>  -and-<br><br>THE ALLSTATE CORPORATION, a Delaware Corporation,<br><br>     Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

By and through her undersigned counsel, Plaintiff Denise Sundquist ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant The Allstate Corporation ("Allstate" or the "Company") against certain current and/or former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, insider selling, and corporate waste, from at least October 30, 2014 to the present (the "Relevant Period"). Plaintiff makes these allegations upon personal knowledge as to those allegations concerning herself and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Allstate and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of news articles, shareholder communications, and postings on Allstate's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related pending securities fraud class action, *In re The Allstate Corporation Securities Litigation,* No. 1:16-cv-10510 (E.D. Ill.) (the "Securities Class Action"); and (e) review of other publicly-available information concerning Allstate and the Individual Defendants (defined below).

## I. NATURE AND SUMMARY OF THE ACTION

1. This shareholder derivative action concerns the ongoing harm caused to Allstate by the Company's Board of Directors (the "Board") and certain of its senior officers, due to their role in issuing a series of false and misleading statements concerning the Company's aggressive plan to grow its auto insurance business. Unbeknownst to the investing public, a key part of this growth strategy included the drastic reduction of Allstate's underwriting standards to attract more customers, which, in turn, caused a significant spike in auto insurance claims frequency and led to lower profit margins for the Company's auto insurance business. During the Relevant Period, the

Individual Defendants breached their fiduciary duties owed to Allstate and its shareholders by, *inter alia*, making, approving, certifying, and permitting improper statements about those critical business concerns in the Company's public filings and proxy statements, as well as in its communications and presentations with analysts and investors.

2.      Allstate is the largest publicly-held personal lines insurer in the United States, as it provides insurance products to approximately 16 million households nationwide.

3.      Allstate is primarily engaged in the property and casualty insurance business, including the sale of life, accident, and health insurance. Allstate's largest and most profitable business line historically has been its auto insurance business. In 2013, Allstate's management embarked on a new strategy to aggressively grow the number of Allstate auto insurance policies in force ("PIF").[1] As a core part of this growth strategy, the Individual Defendants authorized Allstate to relax its underwriting standards, making it easier for agents to write new auto insurance business, which, not surprisingly, led to a significant surge in auto PIF. With the reduction of its underwriting standards, the Company experienced a 1.5% increase in PIF as of December 31, 2013, compared to December 31, 2012; a 2.9% increase in PIF as of December 31, 2014, compared to December 31, 2013; and a 2.1 % increase in PIF as of December 31, 2015, compared to December 31, 2014. During the Relevant Period, the Individual Defendants extoled the surging growth in auto PIF in the Company's press releases, SEC filings, and analyst calls.

4.      However, this aggressive growth strategy was not without risk. By greatly relaxing Allstate's underwriting standards and effectively allowing more drivers with higher risk profiles obtain auto insurance, the Individual Defendants exposed the Company to a much higher rate of

---

[1] PIF refers to active insurance policies at any given time. Policy counts are based on items rather than customers. A multi-car customer would generate multiple item (policy) counts, even if all cars were insured under one policy. A decrease in PIF represents a decrease in polices for which Allstate receives or is to receive payment from customers.

insurance claims from accident-prone customers. Indeed, due to the loosening of its underwriting standards, Allstate experienced a spike in insurance claims during the Relevant Period, which led the Company to pay out more in claims, rendering newly issued PIF to be less profitable.

5. The frequency of claims paid by Allstate began to substantially increase in the latter part of 2014. Specifically, in the fourth quarter of 2014, the Company experienced a ***4.7% increase*** in auto bodily injury paid claims frequency for Allstate brand auto insurance, compared to ***4.7% decrease*** in the fourth quarter of 2013. The increase in claims frequency continued to surge until the third quarter of 2015, at which time Allstate's management decided to reverse course and once again tighten the Company's underwriting standards.

6. During the Relevant Period, the Individual Defendants caused Allstate to make a series of false and misleading statements in the Company's SEC filings and during investor conference calls concerning the increase in claims frequency. For instance, the Individual Defendants caused Allstate to falsely convey to the market that the cause of the increase of claims frequency was due external factors, such as "***increased economic activity and non-catastrophe weather***," rather than attribute the increase to its true cause – the drastic reduction of the Company's underwriting standards. The Individual Defendants also caused Allstate to conceal from investors the fact that its highly-touted PIF growth was actually having a negative impact on the Company's profitability, due to the increase in frequency and costs associated with the surge in claims for newly issued PIF.

7. On August 3, 2015, the Individual Defendants were forced to reveal that the increase in Allstate's claims frequency had persisted for three consecutive quarters and that the increase in claims frequency had been caused by the Company's aggressive growth strategy, particularly the drastic reduction of the Company's underwriting standards. These admissions were in stark contrast to management's prior representations that the increase in claims frequency

was due to external factors. The market reacted swiftly and negatively to Allstate's bombshell revelation, as the Company's stock price plummeted over 10%, falling $7.04 to close at $62.34 on August 4, 2015.

8. The Individual Defendants' false and misleading statements (and other wrongdoing, including their failure to implement, maintain, or follow adequate internal controls) caused Allstate stock to trade at artificially inflated levels during the Relevant Period. After the revelations concerning the Company's drastic reduction in underwriting standards and resulting surge in claims frequency, the Company's stock was hammered by massive sales, driving down the share price from its artificially inflated highs, erasing billions of dollars of the Company's market capitalization.

9. As a result of the Individual Defendants' malfeasance, an aggrieved shareholder filed the Securities Class Action on November 10, 2016. Thereafter, on February 27, 2018, the Honorable Robert W. Gettleman, United States District Court Judge of the Northern District of Illinois, issued an order in the Securities Class Action, denying defendants' motion to dismiss in its entirety and holding that plaintiffs in that case had satisfied the heightened pleading standards of Fed. R. Civ. Proc. 9(b), and the Private Securities Litigation Reform Act ("PLSRA"). Accordingly, Allstate and certain of its officers and directors continue to be exposed to substantial liability for their violations of the federal securities law.

10. The Individual Defendants' misconduct does not end there. During the Relevant Period, while the Company's stock price was artificially inflated, certain of the officers and directors of Allstate exploited their positions as corporate fiduciaries of the Company and, with knowledge of material, adverse, and non-public information regarding the Company's operations and business prospects, sold their personal stock holdings for tens of millions of dollars in insider

profits. These insiders include Allstate's long-time Chief Executive Officer and Chairman of the Board, Thomas J. Wilson; the Company's Chief Financial Officer, Steven Shebik; and long-time Company Directors, Judith A. Sprieser and Alice M Taylor – each of whom took advantage of the artificially-inflated prices to sell their personally held shares of Allstate for proceeds totaling more than $24 million during the Relevant Period.

11. By and through the Individual Defendants' ongoing misconduct, Allstate has sustained and will continue to sustain damages, including hundreds of millions of dollars in losses to the Company's market capitalization, as well as significant harm to its reputation, goodwill, and standing in the business community. Moreover, the Individual Defendants' wrongdoing has exposed the Company to millions of dollars in potential liability from the Securities Class Action, and the significant costs incurred (and to be incurred) in connection with the litigation and potential resolution of that action.

12. The Allstate Board has not commenced, and will not commence, litigation against the Individual Defendants named in this Complaint, let alone vigorously prosecute such claims, because, among other things, a majority of the members of the Board are directly interested in the personal financial benefits challenged herein, that were not shared with Allstate shareholders, and/or face a substantial likelihood of liability to Allstate for breaching their fiduciary duties of loyalty and good faith by authorizing or failing to correct the false and misleading statements alleged herein, and/or lack independence. Accordingly, a pre-suit demand upon the Board was, and is, a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate the Company's rights against its wayward fiduciaries and hold them responsible for the damages they have caused to Allstate.

## II.     JURISDICTION AND VENUE

13.     The Court has diversity jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332, in that Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     The Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations within, this District or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper under 28 U.S.C. §1391 because Allstate maintains offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

16.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.     THE PARTIES

17.     Plaintiff Denise Sundquist is a current shareholder of Allstate stock and has continuously held shares of Allstate stock since 1971.  Plaintiff a citizen of the State of Washington and resides in King County.

18.     Nominal Defendant Allstate is a Delaware corporation with its principal executive offices located at 2775 Sanders Road, Northbrook, Illinois.  The Company's common stock is

traded on the New York Stock Exchange under the ticker symbol "ALL." As of April 17, 2018, there were approximately 351.49 million shares outstanding of Allstate common stock.

19.     Defendant Thomas J. Wilson ("Wilson") has been the Company's Chief Executive Officer ("CEO") since January 2007 and Chairman of the Board since May 2008. Prior to that, Wilson was President of Allstate Protection from 2002 to 2006, and Chairman and President of Allstate Financial from 1999 to 2002. Wilson is a defendant in the Securities Class Action. Wilson received $62,085,922.00 in total compensation from Allstate from 2014 to 2017, including $15,641,385.00 in 2014, $13,873,693.00 in 2015, $13,813,515.00 in 2016, and $18,757,329.00 in 2017. During the Relevant Period, Wilson was the chair of the Executive Committee of the Board. Wilson is a citizen of the State of Michigan and resides in Berrien County. During the Relevant Period, while in possession of material, non-public information, Wilson sold at least 317,225 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $21.4 million.

20.     Defendant Steven E. Shebik ("Shebik") has been the Company's Vice President and Chief Financial Officer ("CFO") since February 2012. Prior to that, Shebik was Allstate's Senior Vice President and CFO of Allstate Investments from January 2009 to February 2012; Senior Vice President and CFO of the Allstate Protection segment from 2005 to December 2008; Senior Vice President and CFO of the Allstate Financial segment from 2003 to 2005; and Senior Vice President, Accounting, Financial Systems & Integration from 2002 to 2003. Shebik received $20,154,701.00 in total compensation from Allstate from 2014 to 2017, including $4,190,774.00 in 2014, $4,063,487.00 in 2015, $4,629,148.00 in 2016, and $7,271,292.00 in 2017. Shebik is a citizen of the State of Illinois and resides in the DuPage County. During the Relevant Period,

while in possession of material, non-public information, Shebik sold at least 30,641 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $2 million.

21.     Defendant Judith A. Sprieser ("Sprieser") has been the Company's Lead Director since May 2015 and a Director of the Company since July 1999.  Sprieser received $1,179,683.00 in total compensation from Allstate from 2014 to 2017, including $246,173.00 in 2014, $298,442.00 in 2015, $305,054.00 in 2016, and $330,014.00 in 2017.  During the Relevant Period, Sprieser was the chair of the Audit Committee and served as a member of the Nominating Governance Committee, the Executive Committee, the Risk and Return Committee.  Sprieser is a citizen of the State of Virginia and resides in Fauquier County.  During the Relevant Period, while in possession of material, non-public information, Sprieser sold at least 4,000 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $283,000.

22.     Defendant Kermit R. Crawford ("Crawford") has been a Director of the Company since 2013.  Crawford received $1,015,373.00 in total compensation from Allstate from 2014 to 2017, including $225,270.00 in 2014, $255,035.00 in 2015, $255,054.00 in 2016, and $280,014.00 in 2017.  During the Relevant Period, Crawford served as a member of the Audit Committee and the Nominating and Governance Committee.  Crawford is a citizen of the State of Illinois and resides in Lake County.

23.     Defendant Michael L. Eskew ("Eskew") has been a Director of the Company since 2014.  Eskew received $955,750.00 in total compensation from Allstate from 2014 to 2017, including $165,647.00 in 2014, $255,035.00 in 2015, $255,054.00 in 2016, and $280,014.00 in 2017.  During the Relevant Period, Eskew served as a member of the Audit Committee, and the Compensation and Succession Committee.  Eskew is a citizen of the State of Georgia and resides in Fulton County.

24.     Defendant F. Duane Ackerman ("Ackerman") was Allstate's Lead Director of the Company from May 2014 to May 2015, and a director from November 1999 to May 2015. Ackerman received $338,872.00 in total compensation from Allstate in 2014 and 2015, including $263,872.00 in 2014 and $75,000.00 in 2015. During the Relevant Period, Ackerman was the Lead Independent Director, a member of the Executive Committee, and a member of the Nominating and Governance Committee from May 2014 to May 2015. Ackerman is a citizen of the State of Georgia and resides in Hancock County.

25.     Defendant Jack M. Greenberg ("Greenberg") was an Allstate director from February 2002 to May 2015. Greenberg received $338,872.00 in total compensation from Allstate in 2014 and 2015, including $263,872.00 in 2014 and $75,000.00 in 2015. Greenberg is a citizen of the State of Illinois and resides in Lake County.

26.     Defendant Robert D. Beyer ("Beyer") was an Allstate director from September 2006 to May 2016. Beyer received $603,165.00 in total compensation from Allstate from 2014 to 2016, including $255,630.00 in 2014, $275,035.00 in 2015, and $72,500.00 in 2016. During the Relevant Period, Beyer was the Chairman of the Risk and Return Committee and served as a member of the Audit Committee and Executive Committee from May 2014 to May 2016. Beyer is a citizen of the State of California and resides in Los Angeles County.

27.     Defendant Herbert L. Henkel ("Henkel") was an Allstate director from March 2013 to May 2017. Henkel received $850,159.00 in total compensation from Allstate from 2014 to 2017, including $277,570.00 in 2014, $255,035.00 in 2015, $255,054.00 in 2016, and $62,500.00 in 2017. During the Relevant Period, Henkel was a member of Allstate's Risk and Return Committee and Compensation and Succession Committee from May 2014 to May 2017. Henkel is a citizen of the State of Florida and resides in Lee County.

28. Defendant Siddharth N. Mehta ("Mehta") has been an Allstate director since 2014. Mehta received $1,092,698.00 in total compensation from Allstate from 2014 to 2017, including $265,507.00 in 2014, $255,035.00 in 2015, $267,142.00 in 2016, and $305,014.00 in 2017. During the Relevant Period, Mehta was the Chairman of Allstate's Risk and Return Committee and served as a member of the Executive Committee and the Audit Committee. Mehta is a citizen of the State of Illinois and resides in Cook County.

29. Defendant Andrea Redmond ("Redmond") has been an Allstate director since 2010. Redmond received $1,067,736.00 in total compensation from Allstate from 2014 to 2017, including $225,270.00 in 2014, $267,398.00 in 2015, $275,054.00 in 2016, and $300,014.00 in 2017. During the Relevant Period, Redmond was the Chair of the Nominating and Governance Committee and served as a member of the Compensation and Succession Committee and the Executive Committee. Redmond is a citizen of the State of Illinois and resides in Kane County.

30. Defendant John Rowe ("Rowe") has been an Allstate director since 2012. Redmond received $1,092,699.00 in total compensation from Allstate from 2014 to 2017, including $237,596.00 in 2014, $275,035.00 in 2015, $275,054.00 in 2016, and $305,014.00 in 2017. During the Relevant Period, Rowe was the Chair of the Compensation and Succession Committee and served as a member of the Nominating and Governance Committee and the Executive Committee. Rowe is a citizen of the State of Illinois and resides in Cook County.

31. Defendant Mary Alice W. Taylor ("Taylor") has been an Allstate director since 2000, and previously a director from 1996 to 1998. Taylor received $1,090,826.00 in total compensation from Allstate from 2014 to 2017, including $225,270.00 in 2014, $270,488.00 in 2015, $280,054.00 in 2016, and $305,014.00 in 2017. During the Relevant Period, Taylor was the Chair of the Audit Committee and served as a member of the Executive Committee and the

Risk and Return Committee. During the Relevant Period, while in possession of material, non-public information, Taylor sold at least 4,000 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $276,000. Upon information and belief Taylor is a citizen of the State of Illinois.

32. Defendant Jacques P. Perold ("Perold") has been an Allstate director since 2015. Perold received $619,067.00 in total compensation from Allstate from 2015 to 2017, including $83,999.00 in 2015, $280,054.00 in 2016, and $280,014.00 in 2017. During the Relevant Period, Perold served as a member of the Nominating and Governance Committee and Risk and Return Committee. Perold is a citizen of the State of Massachusetts and resides in Middlesex County.

33. Defendant Matthew E. Winter ("Winter") was Allstate's President from January 5, 2014 to February 23, 2018 and was the Chief Executive Officer of Allstate Life Insurance Company from January 5, 2015 to February 23, 2018. Winter was also the President of Allstate Insurance Company from 2009 to February 23, 2018. Prior to that, he was Allstate's President of Allstate Personal Lines from December 2013 to January 2015; President of Allstate Auto, Home, and Agencies from February 2012 to December 2013; and President and Chief Executive Officer of Allstate Financial from October 2009 to February 2012. Winter received $23,409,163.00 in total compensation from Allstate from 2014 to 2017, including $4,930,543.00 in 2014, $5,578,860.00 in 2015, $5,191,865.00 in 2016, and $7,707,895.00 in 2017. Winter is a defendant in the Securities Class Action. Winter is a citizen of the State of Illinois and resides in Cook County.

34. Defendants identified in ¶¶ 19-33 are sometimes referred to herein as the "Individual Defendants."

35.     Defendants identified in ¶¶ 19, 23-32 are sometimes referred to herein as the "Director Defendants."

36.     Defendants identified in ¶¶ 21-23, 26, 28, 31 are sometimes referred to herein as the "Audit Committee Defendants."

37.     Defendants identified in ¶¶ 19-21, 31 are sometimes referred to herein as the "Insider Selling Defendants."

**Non-Party Directors**

38.     Margaret Keane ("Keane") is not a defendant in this action.  Keane was appointed to Allstate's Board in 2018 and currently serves as a Director.

39.     Gregg Sherrill ("Sherrill") is not a defendant in this action.  Sherrill was appointed to Allstate's Board in 2017 and currently serves as a Director.  Sherrill is also a member of the Audit Committee and Nominating and Governance Committee.  Sherrill received $134,649 in compensation from Allstate in 2017.

40.     Perry Traquina ("Traquina") is not a defendant in this action.  Traquina was appointed to Allstate's Board in 2016 and currently serves as a Director.  Traquina is also a member of the Compensation and Succession Committee Risk and Return Committee.  Traquina received $190,310.00 in compensation from Allstate in 2016, and $280,014.00 in compensation from Allstate in 2017.

41.     As directors and/or officers of Allstate, the Individual Defendants either knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known the adverse, non-public information about the Company's business, operations, prospects, internal controls, and financials, including the Company's marketing and sales practices, practices because of their access to internal corporate documents, conversations and connections with one another as well as other corporate officers and employees, attendance at Board meetings, and

committee meetings thereof, as well as reports and other information provided to them in connection therewith. The Individual Defendants either participated in, caused, failed to correct, and/or failed to take action to remedy the harm inflicted upon Allstate through, *inter alia*, the issuance of the improper statements disseminated via press releases, SEC filings, and other means to the press, securities analysts, and Allstate stockholders.

## IV. FACTUAL ALLEGATIONS

**Allstate's Corporate Background**

42. Allstate is the largest publicly-held personal lines property and casualty insurer in the United States, providing insurance to more than 16 million households nationwide. The Allstate brand is widely known to the public through its "You're In Good Hands With Allstate" slogan. As of year-end 2015, Allstate had nearly $104.7 billion in total assets.

43. During the Relevant Period, Allstate had four primary business segments: Allstate Protection, Allstate Financial, Discontinued Lines and Coverages, and Corporate and Other. Through its Allstate Protection segment, which includes its Allstate, Encompass and Esurance brands, the Company offers and sells consumer private passenger auto, homeowners, and other personal lines insurance products.

44. This case relates to the Company's "Allstate" brand auto insurance business. Allstate brand products are sold primarily through Allstate exclusive agencies. The Allstate brand's product offerings include Accident Forgiveness, Deductible Rewards, Safe Driving Bonus, and New Car Replacement. In 2017, the Allstate brand represented 91.2% of the Allstate Protection segment's written premium.

**Allstate's Underwriting Practices and the Company's Plan for Auto Insurance Growth**

45. Insurance underwriting is the process of evaluating risk by grouping potential customers with similar characteristics and risk profiles for purposes of deciding whom to insure,

what coverage to offer to, and how much to charge potential insureds. For its underwriting guidelines for auto insurance policies, Allstate considers a number of risk evaluation factors including vehicle make, model and year; driver age and marital status; territory; years licensed; loss history; years insured with prior carrier; prior liability limits; prior lapse in coverage; and insurance scoring utilizing telematics data and certain consumer report information. According to its public filings, Allstate's pricing and underwriting criteria are designed to generate sustainable profitable growth.

46. Allstate's management tracks and reports various performance ratios to determine its underwriting margin, or profitability. Specifically, Allstate's management monitors the "combined ratio," which is the sum of its "loss ratio" and "expense ratio." The loss ratio is the ratio of claims and claims expense to premiums earned. The loss ratio is impacted by the cost of paying claims, as well as the claim frequency, which is the rate of claim occurrence per PIF. The expense ratio is the ratio of amortization of deferred policy acquisition costs, operating costs and expenses, and restructuring and related charges to premiums earned. Because the combined ratio is the sum of the loss ratio and the expense ratio, an increase in either the loss ratio or the expense ratio increases the combined ratio.[2] An increase in the loss ratio, combined ratio, or the underlying combined ratio reflects a negative impact on that particular ratio.

47. Another metric monitored by Allstate's management is "bodily injury paid claims frequency." Bodily injury paid claims frequency is a representation of the number of bodily injury claims that are paid by the Company. Generally, an increase in the frequency of bodily injury claims results in an increase in bodily injury claims paid frequency. Correspondingly, an increase

---

[2] Allstate also uses an "underlying combined ratio" which is the combined ratio excluding the effect of catastrophes, prior year reserve re-estimates, and amortization of purchased intangible assets.

in bodily injury claims paid frequency increases the loss ratio and the combined ratio. Thus, increased bodily injury claim frequency typically results in less profitability for the Company.

48.     During the Relevant Period, Allstate's growth and profitability were closely tied to the Company's underwriting standards. On the one hand, the loosening of Allstate's underwriting standards would yield more potential insurance customers, resulting in the Company's issuance of more PIF. However, the loosening of underwriting standards would also increase Allstate's overall risk because issuing more policies to customers who were more accident-prone and have a higher risk profile would invariably lead the Company pay out more in auto claims -- *potentially to the degree that the Company's claim payout could be more than what it would receive in insurance premiums from PIF*. And, on the other hand then, the tightening of underwriting standards would have the effect of reducing overall risk (leading to fewer policies to be issued), which would likely cause the Company's growth to stagnate or decline.

49.     In 2013, after Allstate had experienced several years of declining auto PIF, the Individual Defendants authorized an aggressive plan for the Company to grow its Allstate brand auto insurance business. A key part of this plan involved the drastic reduction of the Company's auto insurance underwriting standards, which, in turn, would lead to a substantially increase in the number of new auto insurance policies issued. While Allstate's management initially touted the Company's "comprehensive" growth plan to the investing public, management did not reveal that the plan involved the drastic reduction of the Company's underwriting standards until many months later.

50.     The growth plan was characterized as an immediate success. Indeed, once the plan was implemented (and the Company's underwriting standards were significantly relaxed), Allstate saw a dramatic surge in auto PIF. As reported in the Company's Form 10-Ks filed in 2014, 2015,

and 2016, there was a 1.5% increase PIF as of December 31, 2013, compared to December 31, 2012; a 2.9% increase in PIF as of December 31, 2014, compared to December 31, 2013; and a 2.1 % increase in PIF as of December 31, 2015, compared to December 31, 2014. The surge in auto PIF was touted in Allstate's press releases and SEC filings, as well as during the Company's conference calls with investors and analysts.

51. While the loosening of Allstate's underwriting standards led to a significant uptick in auto PIF, it also caused the Company to experience a marked increase in claims frequency, as higher risk customers got into more car accidents. Notably, in the fourth quarter of 2014, the Company experienced a 4.7% increase in the rate of change in bodily injury paid claims frequency for Allstate brand auto insurance, compared to 4.7% decrease in the fourth quarter of 2013. The rate of change in bodily injury claims frequency also increased 4% in fourth quarter 2014, compared to a 1.7% decrease in fourth quarter 2013. Allstate's relaxed underwriting standards similarly affected its property damage (or "PD") paid claims: gross frequency in PD coverage increased 6.3% in 2015 compared to 2014 and increased 0.5% in 2014 compared to 2013.

52. The substantial increase in claims frequency caused the Allstate brand's auto underlying combined ratio to climb sharply in 2015, hitting a record three-year high of 93.4 in 2015, creating an ominously thin profit margin for the Company.[3] As a result, the Company's underwriting income was significantly reduced.

53. During the Relevant Period, the Individual Defendants caused the Company to mislead the investing public by failing to disclose the substantial increase in claims frequency, as well as the attendant increases in the loss ratio and/or underlying combined ratio for its Allstate brand auto insurance line. The Individual Defendants also failed to disclose that the source of the Company's

---

[3] According to its Form 10-K filed with the SEC on February 2, 2016, the Allstate brand's combined ratio in millions was 89.9 in 2013 and 91.5 in 2014.

highly-touted PIF growth was in fact attributable to the Company's relaxed underwriting standards, which the Individual Defendants knew would have a negative impact on the Company's underwriting profitability because of the increase in claims frequency and costs. These issues, as the Individual Defendants were well aware, would affect Allstate's sales and underwriting revenue, making the Company's public statements false and misleading.

**The Individual Defendants Caused Allstate to Make Materially False And Misleading Statements During the Relevant Period**

54. At the start of the Relevant Period, on October 29, 2014, the Individual Defendants caused Allstate to issue a press release and file a current report on Form 8-K with the SEC, announcing the Company's financial and operating results for the third quarter ("Q3") of 2014. According to the press release, the Company's revenues in Q3 2014 increased 5.6% to $8.93 billion, compared to $8.46 billion in Q3 2013. The press release further reported that the Company's "comprehensive" growth plan was increasing the Allstate brand's PIF: "The Allstate brand grew insurance policies in force by 572,000, or 1.9% in the third quarter of 2014 compared to the prior year quarter, *after reflecting a comprehensive plan to generate profitable growth*."

55. On the same day, the Individual Defendants caused Allstate to file with the SEC a quarterly report on Form 10-Q, which reiterated the Company's financial and operating results for Q3 2014 (the "Q3 2014 10-Q"). While the Q3 2014 10-Q affirmatively reported a 2.6% increase in PIF as of September 30, 2014 compared to September 30, 2013, the 10-Q made no mention of the significant increase in claims frequency, or that the Individual Defendant's "comprehensive plan to generate profitable growth" was actively generating higher claim frequencies for bodily injury and property damage. Moreover, the Q3 2014 10-Q failed to disclose that the increase in claims frequencies was caused by Allstate's significantly relaxed underwriting standards.

56.     Additionally, the Q3 2014 10-Q failed to disclose the radical change in its claims frequency trend which turned from negative to positive between Q2 and Q3 2014, and which rapidly accelerated in October 2014.  This material development constituted a "known trend" under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), which required the Company to disclose any known trend or uncertainty that was reasonably expected to have a material unfavorable impact on the Company's net sales or revenues or income from continuing operations.

57.     Notably, the Q3 2014 10-Q contained certifications, pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Defendant Wilson, in his capacity as Chairman and CEO, and Defendant Shebik, in his capacity as Executive Vice President and Chief Financial Officer. The SOX certification stated that the Q3 2014 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in such report fairly presents, in all material respects, the financial condition and result of operations of The Allstate Corporation."  Defendants Friedman and Boone each signed a separate certification stating, in relevant part:

1. I have reviewed this quarterly report on Form 10-Q of The Allstate Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that

material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.    The next day, on October 30, 2014, the Individual Defendants caused Allstate to host an earnings conference call with analysts and investors to discuss the Company's financial results, operations, and guidance.  During the conference call, Defendant Winter, Allstate's President, stated that "***our frequency so far has been extremely favorable to prior year***," adding, "***so our frequency trends have been good***."  Winter further indicated that the Individual Defendants "***stay on top of***" claims frequency trends and "have a pretty long-term history of managing our margins well and ***keeping an eye on both frequency and severity and reacting accordingly***."

59.     Thereafter, on December 9, 2014, the Individual Defendants authorized members of Allstate's senior management to attend an investor conference hosted by Goldman Sachs. During the investor conference, Defendants Wilson and Shebik fielded questions about Allstate's auto insurance business from the audience.  In response to a question from an audience member about the Company's auto insurance rate and whether profitability could be sustained, Defendant Wilson responded that the Company had "tweaked [its] models to improve retention" and explained: "So if you look at the improved retention in our auto business, we are doing a better job of spreading those rate changes more effectively.  *So I feel good about auto insurance in general in terms of its profitability.  It doesn't mean frequency won't tick up*, or we won't mess up in some State, or we don't mess up in some channel."

60.     Immediately following Wilson's response, an audience member asked: "[W]hat's your trend in loss cost inflation? Where are you seeing more pressures on claims inflation?" Shebik responded "So we've seen pretty much inflation consistent with what the indices would be.  If you look at the whole industry for the course of the year, people have been having a few issues in a handful of states in terms of PIF or BI coverages.  *We haven't seen really that much. We've seen much more of an increase consistent with what you assume from the normal trends in the [Consumer Price Index]."*

61.     On February 4, 2015, the Individual Defendants caused Allstate to issue a press release and file a Form 8-K with the SEC, announcing the Company's financial and operating results for the fourth quarter ("Q4") and full year 2014.  The February 4, 2015 press release touted the Company's financial performance for 2014 as "demonstrat[ing] successful execution of the strategy to provide unique value propositions to each customer segment."  The press release further noted: "The Allstate brand accounted for more than 80% of the $1.5 billion growth in net written

premium over prior year, driven by broad-based policy and average premium growth in both auto and homeowners."

62.    The February 4, 2015 press release further stated: "An increase in claim frequency in the first two months of the quarter [October and November 2014] adversely impacted the combined ratio for auto insurance, with the Allstate brand auto combined ratio rising to 97.0. [Which] was 1.7 points higher than the prior year."  Although this was the first time during the Relevant Period that Allstate had revealed that the Company was experiencing an increase in claims frequency, the Individual Defendants sought to portray the increase in claims frequency as being caused by "precipitation in select markets" and "general economic trends."  The February 4, 2015 press release therefore failed to disclose that the increase in claims frequency was actually due to the Company's greatly relaxed underwriting standards.

63.    The next day, on February 5, 2015, the Individual Defendants caused Allstate to host an earnings conference call with analysts and investors to discuss the Company's recent financial results, operations, and guidance.  During the conference call, the Individual Defendants continued to cite external factors as the exclusive cause of increased claims frequency.  When an analyst inquired about causes of the claims frequency, Defendant Wilson suggested that Winter, as the Company's President, had thoroughly analyzed and understood the issue, stating, "[Winter] has been waiting anxiously for your question, because *he's spent [an] untold number of hours over the last really three months* since we saw a tick-up in October.  So we were on this early, and he can give you all the specifics."

64.    Indeed, during the February 5, 2015 conference call, Defendant Winter further addressed the purported reasons for increased claims frequency stating: "*Let me start with what is not driving it.  Number one, we saw nothing to indicate that it's a quality of business issue or*

*that it's being driven by growth, which is a natural question that you would have* . . . ." Winter explained that based on the analysis that Allstate's management had conducted, they "*saw nothing in there that would indicate that it was a quality of business or a growth-related issue*." Winter attributed the spike in claims frequency to "*two factors [that] traditionally drive PD frequency: miles driven and precipitation*."

65.     Winter further assuaged investor concern by representing that the members of Allstate management closely study the issue to the point they are "paranoid," that they "get paid to worry a lot and to focus intensely" on the issue, and "*[i]n no way are we concerned that it's a quality issue*."

66.     During the conference call, an analyst from Goldman Sachs continued to press the issue of claims frequency and attempted to confirm whether the increase in claims frequency was related exclusively to miles driven and weather.  The analyst asked: "So there's not a third factor of why is this happening and what can we do about it that you are concerned about?"  Defendant Winter responded: "*We are confident that we have analyzed this to death, some might say.  We understand the drivers*."  Winter again emphasized that the causes were external factors, stating that "*precipitation and unemployment rates are not Allstate-peculiar issues*" and "*not . . . related specifically to the Company*," but instead were "*related to the general environment*."

67.     While Patrick Macellaro, Allstate's Vice President of Investor Relations, indicated that Allstate brand auto "did experience a spike in the underlying combined ratio in the fourth quarter," and attributed the increase to "higher levels of accident frequency experienced in the first two months of the quarter," he also stated that the frequency spike "was *driven by a combination of increased economic activity and non-catastrophe weather*."

68.     The market accepted the Individual Defendants' false and misleading explanation for the uptick in claims frequency.  On February 5, 2015, analysts from Wells Fargo Securities wrote that it was a "[f]requency blip," and that "Allstate does not think the frequency increase is associated with the quality of business being written or the greater pace of business growth."  Likewise, on the same day, Morningstar Equity Research analysts reported Allstate's fourth quarter increase in claims frequency as "a one-time event."

69.     On February 19, 2015, the Individual Defendants caused Allstate to file its Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K").  Regarding the uptick in claims frequency for Q4 2014, the Individual Defendants again caused the Company to attribute the uptick exclusively to external factors, including "***severe winter weather***," "***higher miles driven,***" and "***higher precipitation***."  The 2014 10-K omitted any information about the Company's greatly relaxed underwriting standards, which was driving factor for the claims frequency increase.  The 2014 10-K also failed to disclose the increase in claims frequency, as required by Item 303.

70.     The 2014 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that were signed by Defendants Wilson and Shebik, stating that the financial information contained in the 2014 10-K was accurate and disclosed all material changes to the Company's internal control over financial reporting.  In addition to being signed by Defendants Wilson and Shebik, the 2014 10-K was signed by Director Defendants Ackerman, Beyer, Crawford, Eskew, Greenberg, Henkel, Mehta, Redmond, Rowe, Sprieser, and Taylor.  Defendants Wilson and Shebik, in their capacities as Allstate CEO and CFO, respectively, each signed a separate certification stating, in relevant part:

1. I have reviewed this report on Form 10-K of The Allstate Corporation;

- 23 -

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

71.     On May 5, 2015, the Individual Defendants caused Allstate to issue a press release and file a Form 8-K with the SEC announcing its financial and operating results for the first quarter ("Q1") of 2015.  In the May 5, 2015 press release, the Company reported that revenues in Q1 2015 had increased 3.1% to $8.95 billion compared to $8.68 billion in 2014.   In the press release, Defendant Wilson continued to allay investor concern about the uptick in claims frequency by stating that "***Allstate's strategy*** of building a broad-based business model ***continued to generate profitable growth . . . .   The Allstate brand had good growth and returns in auto*** . . . ."

72.     On the same day, the Individual Defendants caused Allstate to file a Form 10-Q with the SEC, which reiterated the Company's financial results for Q3 2015 (the "May 2015 10-Q").   Once again, the May 2015 10-Q improperly attributed the cause of the increase in claims frequency to an external factor – "***adverse winter weather***."   The October 2014 10-Q also failed to disclose that the increase in claims frequencies was caused by Allstate's significantly relaxed underwriting standards and narrowing profit margin, despite that Allstate brand quarterly underwriting income was $144 million, a 50% drop off from the quarterly income earned by the Allstate brand for the seven consecutive quarters beginning in Q1 2013.

73.     Notably, the May 2015 10-Q contained certifications, pursuant to the Sarbanes-Oxley Act of 2001 ("SOX") signed by Defendant Wilson, in his capacity as Board Chairman and CEO, and Defendant Shebik, in his capacity as Executive Vice President and Chief Financial Officer.   The SOX certification stated that the May 2015 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in such report fairly presents, in all material respects, the financial condition and result of operations of The Allstate Corporation."   Defendants Friedman and Boone each signed a separate certification stating, in relevant part:

1. I have reviewed this quarterly report on Form 10-Q of The Allstate Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

74.     On May 6, 2015 the Individual Defendants caused Allstate to host an earnings conference call with analysts and investors to discuss the Company's financial results, operations, and guidance.  During the conference call, Macellaro, the Company's VP of Investor Relations, reported on the increase in claims frequency, but again sought to allay investor concern by stating that Allstate's management was closely monitoring claims frequency trends and was "comfortable" with them.  Macellaro noted: "Based on our analysis *we continue to be comfortable with the quality of both our new and renewal business*." Macellaro further stated that Allstate's "analysis also reinforces our conclusion that *recent frequency fluctuations are due primarily to macroeconomic trends in weather* and that while we believe industry-wide auto frequency will continue its long-term downward slope over time, there will be periods of variability within that trend that are driven by external factors."

75.     When an analyst expressed skepticism that the Company "could continue to grow PIF at the current rate," and asked if management planned to take pricing actions that could "lose some PIF [growth] momentum," Defendant Wilson responded:

> [T]he first thing you have to get through: *is this our problem or is this everybody's problem?*  If it is our problem then obviously the actions we take will be different and the impact on shareholder value and long-term value creation is different than if it's everybody's problem.

> If it is everybody's problem then the actions we take and the impact on both growth, profitability, customer satisfaction, ability to expand the agency is completely different.  *So we feel like this is at this point everybody's problem,* Matt [Winter] can help you understand why we believe that is the case.

Defendant Wilson also responded:

> *As we talked about last quarter actually, the frequency pressure is a combination of miles driven and weather*.  And I believe I said last quarter we thought that miles driven was about three times as influential as the weather.  *That pattern seemed to hold up again this quarter*.

> . . . *we did a very intense deep dive into our business to ensure that the increases in the frequency we are seeing* are proportional and consistent across multiple segments of the business no matter how you cut it, to make sure in effect that these *aren't our problems but are in fact external*.

And so we looked at new and renewal business, we looked at higher growth states versus lower growth states. We looked across quality characteristics, we looked across driver age, household composition, insurance scores, full coverage versus liability across different rating plans to see whether or not perhaps rating plans had influenced it.

***And all of that review showed that this trend is externally driven primarily by miles driven.***

\* \* \*

So we validated it with our internal data, we validated with external data and then we look[ed] at other sources to ensure that that in fact is true.

\* \* \*

So you look at all of that and you come to the conclusion that in fact this is an external trend.

76. Moreover, when an analyst asked why the external factors were not affecting Allstate's competitors, Defendant Wilson defensively responded, "[W]e can't answer the question as it relates to other people." Then Wilson reassured the participants on the call by again emphasizing Allstate's visibility with respect to claim frequency trends, stating, ***"We can answer the question which Matt [Winter] talked extensively about which is we don't see anything [in] the way we have done our business. We have the ability to slice and dice our data as if we were our own competitor, right. So we can slice and dice it a whole bunch of ways and we do think it is comprehensive."***

77. The market continued to accept the Individual Defendants' representations about the cause of the claims uptick. On May 6, 2015, an analyst from Credit Suisse Securities Research & Analytics noted that Allstate's "view is that the pickup in trend is driven by external factors so rate increases should be easier to obtain," which made the analysts "more confident that this is not an [Allstate] specific issue," enabling the Company "to push through rate at a faster than expected pace."

78.     A May 6, 2015 analyst report from RBC Capital Markets also reported that "[w]e don't believe this phenomenon is specific to just Allstate, which should make it easier for them to take corrective pricing actions without sacrificing much policy-in-force growth."

79.     On the same day, MKM Partners reported "we would expect better auto results are ahead."

80.     Then, on May 28, 2015 at the Sanford C. Bernstein Strategic Decisions Conference, Defendant Wilson was asked directly about the increase in claims frequency. He responded, "***It just looks sort of benign. If you look at the normal volatility, I would say, we just had a normal volatility. I don't think it's any worse or better than any other time***."

## V.     REASONS THE INDIVIDUAL DEFENDANTS' STATEMENTS WERE IMPROPER

81.     The true facts, which were known or recklessly disregarded by the Individual Defendants during the Relevant Period but concealed from the investing public, were as follows:

a.     The Company had not implemented a "comprehensive plan to generate profitable growth," but rather, the Individual Defendants had simply caused Allstate to underwrite high risk and less profitable auto insurance policies;

b.     Allstate's greatly relaxed underwriting practices resulted in a spike in claims frequency for the Allstate brand auto insurance business, resulting in lower profit margins;

c.     The spike in claims in frequency and lower profit margins were not attributable to external conditions such as "precipitation" and "general economic trends," but were directly caused by the Company's intentionally relaxed underwriting practices; and

d.      based on the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Relevant Period.

82.     As a result of the Individual Defendants' false and misleading statements and omissions, Allstate shares traded at artificially-inflated prices during the Relevant Period. Once the true facts regarding the Company's financial prospects and future business prospects began to emerge, the Company's stock price fell dramatically, erasing hundreds of millions of dollars market capitalization.

## VI.     THE TRUTH EMERGES

83.     On August 3, 2015, the Individual Defendants caused Allstate to issue a press release reporting the Company's financial and operational results for the second quarter ("Q2") of 2015. The August 3, 2015 press release revealed that Allstate was experiencing poor financial results for Q2 2015, due to the third consecutive quarter of increased claims frequency. The press release reported the Company's quarterly operating income of $262 million, which was $350 million (approximately 57%) less than the prior quarter, and disappointing operating EPS of $0.63, a $0.34 (35%) shortfall from analysts' predictions. The press release finally attributed Allstate's bleak operating EPS to "increased frequency and severity of auto accidents," which also "negatively impacted" loss and combined ratios. Both bodily injury and property damage frequency increased approximately 7% on a year-over-year basis.

84.     In August 3, 2015 press release, Defendant Wilson admitted, for the first time, that "*recent growth in Allstate brand auto policies in force did increase [in] frequency* . . . ." Wilson also stated in the press release that Allstate was forced to respond to the higher claims frequency with *"tighter underwriting standards*." Wilson's belated admissions was in stark contrast to management's prior representations attributing the increased claims frequency to external factors.

85.     The market reacted swiftly and negatively to these revelations.  On August 3, 2015, after the Company's disclosures, a Barclays analyst lowered its 2015/16 EPS estimates, in light of "weak P&C underwriting results particularly in auto insurance in what now looks like an issue that will likely take at least several quarters to fix."

86.     On the earnings conference call the next day, Defendant Winter confirmed that the growth in Allstate's auto business line —achieved through the drastic reduction of the Company's underwriting standards to issue more PIF—had in fact contributed to the sharp decrease in the Company's underwriting profitability, and even admitted, quite shockingly, that this negative result "was expected."  Specifically, Winter stated:

> As you know, new business normally runs at a higher frequency level than renewal customers.  **We often refer to this as a new business penalty**.
>
> \*        \*        \*
>
> **So we analyzed how the volume of new auto business we've written in the past two years has impacted our results**.
>
> Our analysis indicated that the new business growth rate is having between 0.5 and 1 point impact on the auto loss ratio.  **This impact was expected** and manageable.

87.     Winter went on to concede that underwriting was a significant part of the problem:

> In conjunction with our broad rate increases, **we are also engaged in very targeted and segmented rate actions and underwriting changes** wherever we identify specific underperforming segments of business.
>
> \*        \*        \*
>
> [A] third lever that we're engaging in this effort, because **we are in fact tightening some of our underwriting parameters** and providing some **increased focus on correct class programs.**  And we'll continue to use underwriting in conjunction with that.

88.     A few days later, on August 5, 2015, in a report entitled "Allstate Corporation: Frequency and Severity Push Losses Higher for Third Straight Quarter," Morgan Stanley lowered

its 2015-16e estimate to $4.72/$5.47 from $5.38/$5.51 due to "higher auto claims frequency and severity pressuring margins . . . ."

89.     In response to the foregoing revelations, Allstate's stock price plummeted more than 10% on unusually high trading volume of over 13 million shares to close at $62.34 on August 4, 2015.

90.     Thereafter, on a conference call with analysts and investors on February 4, 2016, Defendant Wilson explained that the Company's accident and claims frequency was driven by "miles-driven but also weather, distracted driving, new business volume, new business quality *and underwriting*."

## VII.   INSIDER SELLING

91.     Not all of the Company's shareholders were harmed by the Individual Defendants' misconduct.  During the Relevant Period, while in possession of material, adverse, non-public information, certain of the Individual Defendants unloaded their holdings of Allstate stock at bloated prices.  Specifically, the Insider Selling Defendants (including Defendants Wilson, Shebik, Sprieser, and Taylor) took advantage of the artificially-inflated prices to sell their Allstate shares for substantial proceeds.  As detailed below, these Insider Selling Defendants sold *more than $24 million* of personally held common stock.

92.     Defendant Wilson was and is Allstate's CEO and Chairman of the Board.  During the Relevant Period, Wilson was aware of material, non-public information regarding the inaccuracy of the Company's statements, including his own misstatements, in the Company's press releases and public filings.  On November 26, 2014 and May 26, 2015, while in possession of this information, Wilson sold at least 317,225 personally held shares of Allstate stock at artificially inflated prices for proceeds of almost *$21.4 million*.

93.     Defendant Shebik was and is the Company's Vice President and Chief Financial Officer.  During the Relevant Period, Shebik was aware of material, non-public information regarding the inaccuracy of the Company's statements in the Company's press releases and public filings.  On May 12, 2015, while in possession of this information, Shebik sold at least 30,641 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $*2 million*.

94.     Defendant Sprieser is the Company's Lead Director.  During the Relevant Period, Sprieser was aware of material, non-public information regarding the inaccuracy of the Company's statements in the Company's press releases and public filings.  On February 27, 2015, while in possession of this information, Sprieser sold at least 4,000 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $283,000.

95.     Defendant Taylor was and is a member of the Company's Board.  During the Relevant Period, Taylor was aware of material, non-public information regarding the inaccuracy of the Company's statements in the Company's press releases and public filings.  On March 11, 2015, while in possession of this information, Taylor sold at least 4,000 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $276,000.

96.     The foregoing insider sales, which resulted in total proceeds of more than $24 million, are summarized in the following chart.  These insider sales were executed under highly suspicious circumstances and occurred while the Company's stock price was artificially inflated due to the misrepresentations and omissions alleged herein.

|  | Transaction Date | Number Transacted | $ Per Share | Total $ |
|---|---|---|---|---|
| Wilson | 11/26/2014 | 224439 | $67.51 | $15,151,876.89 |
|  | 5/26/2015 | 92786 | $67.43 | $6,256,559.98 |
|  | **TOTAL** | **317,225** | **TOTAL** | **$21,408,436.87** |

| | | | | |
|---|---|---|---|---|
| Shebik | 5/12/2015 | 30641 | $66.79 | $2,046,512.39 |
| | **TOTAL** | **30,641** | **TOTAL** | **$2,046,512.39** |

| | | | | |
|---|---|---|---|---|
| Sprieser | 2/27/2015 | 4000 | $70.86 | $283,440.00 |
| | **TOTAL** | **4,000** | **TOTAL** | **$283,440.00** |

| | | | | |
|---|---|---|---|---|
| Taylor | 3/11/2015 | 4000 | $69.00 | $276,000.00 |
| | **TOTAL** | **4,000** | **TOTAL** | **$276,000.00** |

| | | | | |
|---|---|---|---|---|
| | *GRAND TOTAL* | **355,866** | | **$24,014,389.26** |

## VIII.   DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

97.     By reason of their positions as officers, directors, and/or fiduciaries of Allstate, and because of their ability to control the business and corporate affairs of Allstate, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Allstate in a fair, just, honest, and equitable manner.  The Individual Defendants were, and are, required to act in furtherance of the best interests of Allstate and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

98.     Each director and officer of the Company owes to Allstate and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

99.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allstate, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Allstate, each of the Individual Defendants had

knowledge of material, non-public information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

100.    To discharge their duties, the officers and directors of Allstate were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of Allstate were required to, among other things:

      a)      exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b)      exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner, and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

      c)      when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**Audit Committee Duties**

101.    In addition to these duties, the members of the Audit Committee (Defendants Sprieser, Crawford, Eskew, Mehta, and Taylor) owed specific duties to Allstate under the Audit Committee's Charter, including duties to review and approve quarterly and annual financial

statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

102.     According to the Company's Audit Committee Charter, the Audit Committee was tasked with the following specific responsibilities and duties:

- Review the Corporation's financial statements and other financial information. The Committee reviews and discusses with management, its chief audit executive, and the independent registered public accountant the Corporation's annual audited and quarterly financial statements, including management's discussion and analysis of financial condition and results of operations and risk factors;

- Review the Corporation's system of internal control and disclosure controls, enterprise risk control assessment and management, ethics and compliance, and procedures for receipt, retention, and treatment of complaints and concerns pursuant to the requirements of the Sarbanes-Oxley Act;

- Review a report on the adequacy of internal control over financial reporting and disclosure controls and procedures that could significantly affect the Corporation's financial statements or MD&A and any special audit steps adopted in light of material control deficiencies;

- Review disclosures made to the Committee by the Corporation's chief executive officer and chief financial officer during their certification process for the annual and quarterly financial reports about any significant deficiencies in the design or operation of internal controls over financial reporting or material weaknesses in such controls and any fraud involving management or other employees who have a significant role in the Corporation's internal controls; and

- Discuss guidelines and policies that govern the process by which risk assessment and risk management is handled, including the Corporation's major financial risk exposures and the steps management has taken to monitor and control them.

103.     Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**Duties Pursuant to the Company's Global Code of Business Conduct**

104.     Additionally, the Individual Defendants, as officers and/or directors of Allstate, are bound by the Company's Global Code of Business Conduct (the "Code"), which includes the

Company's purported commitment to "operate with the highest degree of integrity and honesty" and applies to "every employee and officer, as well as outside directors, of [ ] Allstate." The Code memorializes various policies of the Company, including: preventing insider trading, avoiding conflicts of interest, following internal controls, creating, maintaining and disclosing accurate records and accounts, and maintaining honesty, caring, and integrity on a global scale.

**Duties Pursuant to the Company's Insider Trading Policy**

105.    The Code also contained a strict insider trading policy, pursuant to which the Individual Defendants were bound, as follows:

- Allstate and all of its officers, directors, and employees are prohibited from trading in securities of the Corporation on the basis of material, nonpublic information about Allstate. Officers, directors, and employees of Allstate are also prohibited from assisting others to trade in Allstate securities on the basis of material, nonpublic information.

- Allstate officers, directors, and employees who, in the course of their work, learn of material, nonpublic information about another company are prohibited from trading in the securities of such other company. Such individuals are required to maintain the confidentiality of material, nonpublic information until it has been broadly disseminated to the public or until the information is no longer material.

**C.    Control, Access, and Authority**

106.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Allstate, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Allstate.

107.    Because of their advisory, executive, managerial, and directorial positions with Allstate, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Allstate.

108.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Allstate, and was at all times acting within the course and scope of such agency.

**D.    Reasonable and Prudent Supervision**

109.    To discharge their duties, the officers and directors of Allstate were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Allstate were required to, among other things:

      a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

      b.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      c.    properly and accurately guide investors and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

      d.    remain informed as to how Allstate conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

      e.    ensure that Allstate was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## X.     BREACHES OF DUTIES

110.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to Allstate and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Allstate, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Allstate, the absence of good faith on their part, and a reckless disregard for their duties to Allstate and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Allstate.

111.    The Individual Defendants each breached their duties of loyalty and good faith by issuing, or causing the Company to issue, false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

112.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, Allstate has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## IX.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

113.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

114.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing

that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

115. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

116. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

117. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## X. DAMAGES TO ALLSTATE

118. As a result of the Individual Defendants' wrongful conduct, Allstate disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Allstate's credibility.

Additionally, Allstate is the subject of the Securities Class Action. Allstate has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

119.     As a direct and proximate result of the Individual Defendants' actions as alleged above, the Company's market capitalization has been substantially damaged, losing hundreds of millions of dollars in value as a result of the conduct described herein.

120.     Further, as a direct and proximate result of the Individual Defendants' conduct, Allstate has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

a.     costs incurred in investigating and defending Allstate and certain officers in the Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

b.     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based, at least in part, on the Company's artificially-inflated stock price; and

c.     costs incurred from the loss of the Company's customers' confidence in Allstate and its services and products.

121.     Moreover, these actions have irreparably damaged the Company's corporate image and goodwill. For at least the foreseeable future, Allstate will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that the Company's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## XI.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

122.     Plaintiff brings this action derivatively in the right and for the benefit of Allstate to redress injuries suffered, and to be suffered, by Allstate, as a direct result of the Individual

Defendants' breaches of fiduciary duties and other violations of law. Allstate is named as a nominal defendant solely in a derivative capacity.

123. Plaintiff will adequately and fairly represent the interests of Allstate in enforcing and prosecuting its rights.

124. Plaintiff has continuously been an Allstate shareholder at all relevant times, including at the time of the Individual Defendants' wrongdoing complained of herein. Specifically, Plaintiff has continuously been a shareholder of Allstate since 1971.

125. Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

126. At the time this action was commenced, the Board of Allstate consisted of the following twelve (12) directors: Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor, and non-Defendants Keane, Sherrill, and Traquina. A majority of these individuals are not disinterested and independent with respect to the acts and omissions alleged herein. Notably, Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor face a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein. Where a plaintiff alleges that at least half of the members of the current board are not independent or disinterested, demand is excused as futile.

127. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand is Futile as to Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor Because They Face a Substantial Likelihood of Liability**

128. Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor face a substantial likelihood of liability for their individual misconduct. As directors

of Allstate during the Relevant Period, Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor had fiduciary duties to ensure the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its financial and business prospects were accurate.

129.    Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor each breached their fiduciary duties of loyalty and good faith by causing or allowing improper statements to be made in the Company's press releases, SEC filings, investor conference calls, and presentations during the Relevant Period.  As members of the Board, Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor had a fiduciary duty to ensure that the Company's public statements and SEC filings were complete, accurate, and true. By authorizing the false and misleading statements alleged herein during the Relevant Period, and by failing to correct the false and misleading statements made by Defendants Wilson, Winter, and other Allstate officers during such time, Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor were active participants in breaches of duties of good faith, candor, and loyalty, and have subjected the Company to a lawsuit asserting violations of the federal securities laws.  A director's breach of the duty of candor is not entitled to protection under the business judgment rule.  As a result, any demand upon Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor to bring suit against themselves, or against the executive management of the Company, would be a useless and futile act.

130.    Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor either knew or should have known of the false and misleading statements that were issued on the Company's behalf, but none of them took any steps in a good faith effort to prevent or remedy that situation.

131. Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor approved and/or permitted the wrongs alleged herein to occur, and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or, recklessly and/or with gross negligence, disregarded the wrongs complained of herein, and are therefore not disinterested parties.

132. Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

133. Additionally, Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor, as Allstate directors (and, in some cases, also as Audit Committee members), owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's disclosure controls and procedures and/or internal auditing and accounting controls over financial reporting were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor knowingly and/or with reckless disregard reviewed, authorized, and/or caused the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices. As such, they all face a substantial likelihood of liability for the claims asserted herein. Demand is therefore futile.

134.    Further, Defendants Wilson, Crawford, Eskew, Mehta, Redmond, Rowe, Sprieser, and Taylor breached their fiduciary duties when they signed and certified Allstate's 2014 10-K, which contained false and misleading statements and/or omitted necessary information to make the statements contained therein not false and misleading, as alleged herein.  As a result, each of Defendants Wilson, Crawford, Eskew, Mehta, Redmond, Rowe, Sprieser, and Taylor face a substantial likelihood of liability for making the false and misleading statements contained therein, rendering any demand upon them futile.

135.    Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.  The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound, business judgment would view this exchange of consideration for services rendered as fair or reasonable.

136.    Defendants Wilson, Crawford, Eskew, Mehta, Perold, Redmond, Rowe, Sprieser, and Taylor's making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's duties were being discharged in good faith and with the required diligence, and/or acts of corporate waste and abuse of control constitute breaches of fiduciary duties, for which they face a substantial likelihood of liability.  If they were to bring a suit on behalf of Allstate to recover damages sustained as a result of this

misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile.

**B.     Demand is Futile as to the Audit Committee Defendants**

137.    During the Relevant Period, Defendants Sprieser, Crawford, Eskew, Mehta, and Taylor served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were specifically responsible for, among other things, reviewing and approving quarterly and annual financial statements and earnings press releases, overseeing the Company's internal controls over financial reporting, and discharging their other duties described herein. Despite these clear duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of, false and/or materially-misleading earnings press releases and quarterly and annual financial statements, and failed in their specific duties to ensure that the Company's internal controls over financial reporting were sufficient and that statements made by the Company regarding its business and financial prospects were accurate. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

**C.     Demand is Futile as to Defendant Wilson for Additional Reasons**

138.    Demand is also futile as to Defendant Wilson, as Allstate admits that Wilson does not meet the standards of director independence, given his status as a current employee of the Company. Defendant Wilson currently serves as Allstate's CEO, and in that executive capacity, he received substantial compensation from the Company. For example, Wilson received $18,757,329.00 in total compensation (including salary, bonus, stock awards, option awards and other compensation) from Allstate in 2017 and $13,813,515.00 in total compensation (including

salary, bonus, stock awards, option awards and other compensation) from Allstate in 2016. Accordingly, Wilson is neither independent nor disinterested because he financially benefited from his own wrongdoing and the wrongdoing of other Individual Defendants, and because he continues to depend on compensation from Allstate to support his livelihood.

139.     Defendant Wilson also cannot disinterestedly consider a demand to bring suit against himself because he is named as a defendant in the Securities Class Action, which alleges he made many of the misstatements described above in violation of the federal securities laws. Notably, on February 27, 2018, Judge Gettleman issued an order in the Securities Class Action (the "February 27, 2018 Order"), holding that the federal securities fraud allegations could proceed against Allstate and members of the Company's senior management, including Winter.  Judge Gettleman singled out Wilson, as well as Defendant Winter, and found that Wilson was responsible for making many of the statements alleged to be false and misleading, and that he acted with scienter.  See February 27, 2018 Order at 11 ("Plaintiffs' complaint read in its entirety gives rise to a strong inference of scienter, that is, one that is 'at least as compelling as any opposing inference one could draw from the facts alleged.'").  If Wilson is ultimately found liable in the Securities Class Action, then Allstate will be held liable for securities fraud under theories of respondent superior and Section 20A of the Securities Exchange Act of 1934.

140.     Thus, if Defendant Wilson were to initiate suit in this action, he would compromise his ability to simultaneously defend himself in the Securities Class Action and would expose himself to liability in this action.  Wilson will not do this.  Any demand on Wilson is therefore futile.

**C.     Demand is Futile as to Defendants Wilson, Shebik, Sprieser, and Taylor Based on Insider Selling**

141.    Demand is futile as to Defendants Wilson, Shebik, Sprieser, and Taylor because, as alleged herein, they engaged in insider trading activities during the Relevant Period when they knew of adverse, material, non-public information about the Company's business condition and financial outlook that was not being disclosed to stockholders.

142.    On the basis of this non-public information, Defendants Wilson, Shebik, Sprieser, and Taylor timed sales of Allstate stock to maximize profit from the Company's then artificially inflated share price.  As a result of these illicit insider sales, they received direct financial benefits not shared with Allstate shareholders, and are, therefore, directly interested in a pre-suit demand. In fact, while in possession of material, non-public information, Defendants Wilson, Shebik, Sprieser, and Taylor sold at least 351,886 personally held shares of Allstate stock at artificially inflated prices for proceeds of approximately $24,014,389.  Furthermore, they are interested in a demand because they face a substantial likelihood of liability for breaches of fiduciary duties of loyalty and good faith based on their challenged insider sales.  As such, demand upon Defendants Wilson, Shebik, Sprieser, and Taylor is futile.

**C.     Demand is Futile as to All Directors for Additional Reasons**

143.    The current Board of Allstate has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite ongoing misconduct by the Company's executive officers, including Defendants Wilson and Shebik, who still respectively serve as Allstate's CEO and CFO, the Board has taken no action to address the harm this misconduct has caused to the Company.

144.    Moreover, each of the current Directors receives annual cash compensation, as well as awards of Allstate stock, purely for serving as Board member.  This compensation provides a

substantial stipend to these directors, from which each of them personally benefits and depends on for his or her livelihood. The total compensation to these Directors in the form of retainer fees, stock awards and other compensation for 2016 and 2017 was as follows:

| Name | Wilson | Sprieser | Sherrill | Crawford | Eskew | Mehta | Perold | Redmond | Traquina |
|------|--------|----------|----------|----------|-------|-------|--------|---------|----------|
| 2017 | $18,757,329.00 | $330,014.00 | $134,649.00 | $280,014.00 | $280,014.00 | $305,014.00 | $280,014.00 | $300,014.00 | $280,014.00 |
| 2016 | $13,813,515.00 | $305,054.00 | | $255,054.00 | $255,054.00 | $267,142.00 | $255,054.00 | $275,054.00 | $190,310.00 |
| **Total** | **$32,570,844.00** | **$635,068.00** | **$134,649.00** | **$535,068.00** | **$535,068.00** | **$572,156.00** | **$535,068.00** | **$575,068.00** | **$470,324.00** |

145. Finally, a pre-suit demand on each of the Directors is futile because, through their course of conduct to date, they have demonstrated their unwillingness to undertake any action that would threaten the economic benefits they receive as members of Allstate's Board. If Allstate's current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Allstate against the Individual Defendants, known as the "insured versus insured exclusion."

146. As a result, if the members of Allstate's Board were to sue themselves or certain officers of Allstate, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the members of the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

147.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Allstate by prosecuting this action.  Therefore, demand on Allstate and its Board is futile and is excused.

148.    Allstate has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

149.    Plaintiff has not made any demand on shareholders of Allstate to institute this action since such demand would be a futile and useless act for the following reasons:

      a.    Allstate is a publicly-traded company with thousands of shareholders of record;

      b.    making demand on such a number of shareholders would be impossible for Plaintiff, who has no means of collecting the names, addresses, or phone numbers of Allstate shareholders; and

      c.    making demand on all shareholders would force Plaintiff to incur excessive expense and obstacles, assuming all shareholders could even be individually identified with any degree of certainty.

## COUNT I

## AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACHES OF FIDUCIARY DUTIES

150.    Plaintiff hereby incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.     The Individual Defendants owed, and owe, Allstate fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed, and owe, Allstate the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.  In addition, the Individual Defendants had a duty to act in the best interests of the Company and its shareholders, and not to act in furtherance of their own self-interests.

152.     As set forth herein, the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision. The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

153.     Additionally, as is also alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's disclosures were complete and accurate, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

154.     As executive officers of Allstate and members of the Allstate Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor, the practices which resulted in violations of the law as alleged herein.  Each of them had knowledge of, actively participated in, and/or approved of, or acquiesced in, the wrongdoings alleged herein, or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected Allstate to unreasonable risks of loss and expenses.

155.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Allstate has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.     Plaintiff, on behalf of Allstate, has no adequate remedy at law.

## COUNT II

### AGAINST THE INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

157.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

158.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Allstate.

159.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Allstate.

160.     Plaintiff, as a shareholder and representative of Allstate, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

161.     By reason of the foregoing, Allstate was damaged.

162.     Plaintiff, on behalf of Allstate, has no adequate remedy at law.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

163.     Plaintiff hereby incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

164.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Allstate' internal controls, by issuing, causing the issuance

of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and on-going harm to the Company.

165.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

166.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

167.    By reason of the foregoing, Allstate was damaged.

168.    Plaintiff, on behalf of Allstate, has no adequate remedy at law.

## COUNT IV

### AGAINST THE INSIDER SELLING DEFENDANTS FOR BREACH OF FIDUCIARY DUTY THROUGH THE MISAPPROPRIATION OF MATERIAL, NON-PUBLIC INFORMATION

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    At the time the Insider Selling Defendants sold their Allstate stock, they knew the information described above and sold Allstate stock on the basis of such information.

171.    The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Allstate stock.

172.    The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

173.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

174.    Plaintiff, on behalf of Allstate, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants for the amount of damages sustained by the Company as a result of Defendants' wrongdoing as alleged herein;

B.    Directing Allstate to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Allstate and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Allstate directors, executives, and other employees;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the shareholders of Allstate to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's oversight and controls over insiders' purchase and sale of Company stock;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions.

C. Awarding to Allstate restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: May 21, 2018   **MILLER LAW LLC**

*/s/ Lori A. Fanning*

Lori A. Fanning
115 S. LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400
Facsimile: (312) 676-2676
Email: lfanning@millerlawllc.com

**JOHNSON FISTEL, LLP**
Frank J. Johnson
Phong L. Tran
Kristen L. O'Connor
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
Email: frankj@johnsonfistel.com
       phongt@johnsonfistel.com
       kristeno@johnsonfistel.com

*Attorneys for Plaintiff Denise Sundquist*